Maximo HERNANDEZ, Jr., Appellant,

v.

Clifford L. ALEXANDER, Jr., Secretary of the Department of the Army, Appellee.

No. 78–1550.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 13, 1979.

Decided Oct. 18, 1979.

Ann Yalman, Santa Fe, N. M., for appellant.

Charles N. Estes, Jr., Asst. U. S. Atty., Albuquerque, N. M. (R. E. Thompson, U. S. Atty., Albuquerque, N. M., with him on the brief), for appellee.

Before SETH, Chief Judge, LOGAN, Circuit Judge, and BOHANON, District Judge.*

SETH, Chief Judge.

This appeal presents two basic questions derived from five separate actions filed in the district court under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq. These suits asserted some twenty-eight instances of employment discrimination against the plaintiff who describes himself as a Mexican-American. The plaintiff was a civilian employee of the Government with a GS–13 rating at the White Sands Missile Range. The defendant was Secretary of the Army.

The claims of discrimination center on the fact that plaintiff was not promoted to the rating of Supervisory General Engineer, GS–14, with the title, "Chief of Plans and Analysis," and upon the subsequent transfer of plaintiff.

The position sought by plaintiff was created by a reorganization plan and thus a vacancy existed. The selection process began with the use of a list of some 213 names. A committee of three persons at White Sands considered these candidates and reduced the number to nine. This list was submitted to the selecting official, Mr. Sweet. Plaintiff's name was on this list as was the name of the person selected, Mr. Bill Meeks.

The plaintiff, Mr. Max Hernandez, at the time he sought the GS–14 position, was Chief of Plans and Operations, GS–13, and had been in that position about twenty months. Mr. Meeks had left the safety division at White Sands some nine years before the selection date. Before his departure he was for ten years in the division, and at the end of the period he was in the position held by Mr. Hernandez at the selection date. Mr. Meeks during the nine years had been assigned duties other than with the Missile Flight Surveillance Division at White Sands and to work involving advanced weapons planning and instrumentation. The plaintiff, at the time the position he sought was created, was regularly performing duties relating to missile flight safety. Mr. Meeks had done this same work some nine years before, and had re-

* Of the Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

ceived some additional experience and training in the larger field of missile instrumentation and weapons planning. Mr. Hernandez was fully qualified for the position he sought.

The officer who selected Mr. Meeks stated that he did so because he had "broader" qualifications than did Mr. Hernandez. The plaintiff urges that the job requirements for the new position included "state of the art" knowledge, and this could only be met by someone then actively participating in actual firings and in the development of safety plans on a current basis. Thus plaintiff argues that he met the "state of the art" requirements while Mr. Meeks did not, and the disparate treatment was thereby evidenced.

The trial court in its memorandum referred to plaintiff's proof which showed that Mexican-Americans were underrepresented in the higher GS ratings at White Sands. The trial court also referred to the difficulties the EEO committee had met at White Sands. This was the substance of the circumstantial evidence presented to demonstrate a discriminatory motive. These references in the memorandum of the trial court show that this evidence was considered, and plaintiff's arguments to the contrary are not persuasive.

This is, of course, a disparate treatment case as defined in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396. Thus, as there indicated, " . . . [p]roof of discriminatory motive is critical . .." The district court ruled that the plaintiff had established a prima facie case of discrimination under the *McDonnell Douglas* standard. It also held that defendant had met his resultant burden by "articulating some legitimate nondiscriminatory reason" for not selecting plaintiff, again in accordance with *McDonnell Douglas*. The court concluded that the reason advanced by defendant constituted a legitimate management decision.

The trial court applied the correct standards as to the burdens of the parties as the trial progressed. The court, as indicated

above, concluded that legitimate reasons prevailed. The appellant urges that this decision was not accompanied by a statement as to how it was reached. However, the reason expressed for the management decision was the experience of Mr. Meeks in the wider aspect of the field with which the Plans and Analysis Branch was concerned. This was an uncomplicated fact issue, and the trial court found that such a nondiscriminatory reason had been established. This obviously was an evaluation under *McDonnell Douglas*. The trial court said that the burden had been met by the defendant " . . . by articulating some legitimate, nondiscriminatory reasons for the employee's rejection." The court thus demonstrated that the proof advanced by the defendant was adequate to meet the prima facie case. The trial court stated:

" . . . In this case, neither the selecting official nor any member of the special personnel selection review board felt that plaintiff was as well qualified as the person who was ultimately selected for the new GS–14 position. As plaintiff has not demonstrated that the reasons for his rejection were invalid or 'were in fact a coverup for a racially discriminatory decision,' id. at 805, he has not established a violation of Title VII in either the 1975 reorganization of MFSD or in the selection of Mr. Meeks for the GS–14 position created by that reorganization."

■ The nature of the prima facie case under *McDonnell Douglas* was examined by the Supreme Court in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957, as to applicant's meeting certain hiring practices. The Court there said in part:

" . . . [I]t is apparent that the burden which shifts to the employer is merely that of proving that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race."

The Court continued a few sentences later:

"To dispel the adverse inference from a prima facie showing under *McDonnell Douglas*, the employer need only 'articu-

late some legitimate, nondiscriminatory reason for the employee's rejection.'"

Thus again the Court uses the term "articulate" and treats the prima facie case as resting on presumptions. A presumption can be dispelled by an articulation of valid reasons. We consider the statements made by the Court in *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 to be very significant by the emphasis on the *articulation* of reasons as compared with proving the absence of a discriminatory motive. The Court in *Keene State College* said in part:

"... [W]e think that there is a significant distinction between merely 'articulat[ing] some legitimate, nondiscriminatory reason' and 'prov[ing] absence of discriminatory motive.' By reaffirming and emphasizing the *McDonnell Douglas* analysis in *Furnco Construction Co. v. Waters,* supra, we made it clear that the former will suffice to meet the employee's prima facie case of discrimination."

■ Thus again the trial court applied the correct test. The defendant here dispelled the presumption arising from plaintiff's proof in accordance with the several cases referred to above.

■ As to the transfer issue raised by the appellant, it is apparent from a reading of the record that it was very closely connected with the reorganization, and with the failure of appellant to be selected for the GS–14 position thereby created. It should also be borne in mind that appellant's superior, the Chief of Division, Mr. Sweet, who made the selection, was transferred at the same time. His transfer also had its origins in the conflicts and friction which arose from the same matters. Again the trial court's memorandum indicates that the circumstantial evidence was considered. The trial court concluded that plaintiff's transfer was justified and was a legitimate management decision. The court, in referring to the testimony of one of the witnesses, said:

"General Tobiason, who approved plaintiff's temporary transfer from MFSD, testified that he did so, and at the same time approved the transfer of Mr. Sweet from MFSD because he had become convinced that the intense personal conflicts within that division posed a serious threat to the safety of missile tests at WSMR."

The trial court also referred to plaintiff's "intransigence and opposition to management decisions at all levels which grew out of his dissatisfaction with the reorganization and his failure to be promoted to the GS–14 position . . .."

It is apparent from the record that those in authority were seriously concerned with safety and operational problems which arose from the personnel conflicts in the division, a division which was responsible for range safety. The record clearly supports the conclusions and findings of the trial court. The appropriate legal standards were applied.

There is a somewhat unusual element in this case which arises from the large number of EEO complaints filed by the plaintiff. As the trial court indicated, it heard five separate suits relating to some twenty-eight separate complaints. The trial court found:

"... As relations within MFSD deteriorated following the reorganization, however, it appears that plaintiff filed an EEO charge for every slight he perceived, actual or imagined. The twelve issues involved in this present suit are only a very small fraction of the plethora of charges actually filed by plaintiff since the 1975 reorganization. Several witnesses testified that there always existed the threat that plaintiff would bring EEO charges if his opinions were not accepted. He frequently indicated that what was being said would be noted and included in EEO charges and he often insisted on having witnesses or EEO representatives with him during conversations with management. As time went on, plaintiff apparently spent an increasing portion of his working day preparing EEO complaints."

There was testimony that it reached a point where the plaintiff was spending about thirty-five percent of his working hours preparing EEO complaints.

■ The trial court found that there had been no retaliation. The plaintiff urges that the trial court in so concluding applied an erroneous standard as to the transfer. This point arises from the trial court's reference to the number of EEO filings by plaintiff. The court in part said:

"It is obviously difficult to probe the basis of people's motivations in such a complex and highly volatile situation as that which existed at MFSD, but based on the testimony as a whole, the Court is not persuaded that the actions of WSMR's command officials in proposing plaintiff's transfer on March 11, 1976, and in ordering such transfer on August 9, 1976, were entirely unaffected by plaintiff's wholesale filing of EEO complaints. It cannot be determined exactly what part of the command's motivation could be considered retaliation. However, the commanding officials did have a serious desire to bring about a badly needed improvement in the conditions at MFSD. The evidence establishes that the commanding officials were legitimately and justifiably satisfied that the actions taken were necessary for the safety and efficiency of MFSD and that they would have taken such action regardless of the EEO complaints filed by plaintiff."

We must consider the reference as being to the great quantity of complaints, thus the "wholesale" filing, and also to the large number of working hours spent in their preparation. These factors took the matter out of the usual retaliatory standards. For all practical purposes they were no longer EEO complaints, but an occupation of plaintiff in itself and within his principal job. It is apparent that such an activity, pursued to the extent it was, and under the circumstances, must be regarded as something quite different from the typical filing of EEO complaints and so different that they are removed (considering them as a whole as did the trial court) from the application of the usual standards. These complaints became very nearly the principal activity of the plaintiff and were a part of his continuing resistance to the reorganization. The fact that there were a great number of filings was not used to evaluate the validity of any particular one. *See East v. Romine, Inc.*, 518 F.2d 332 (5th Cir.). The filings were thus properly treated as an element in the day-to-day work of plaintiff, as an element in the conflict with Mr. Sweet, and a real factor in the apprehension of the command officers as to whether the Division could carry out its objectives. This view of the filings is not contrary to the objectives of Title VII. The appellant would apply standards from NLRB cases such as *NLRB v. George J. Roberts & Sons, Inc.*, 451 F.2d 941 (2d Cir.). The appellant also cites *Day v. Mathews*, 174 U.S.App.D.C. 231, 530 F.2d 1083 (D.C.Cir.), and *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir.), but the general statements therein contained are not to the contrary.

AFFIRMED.