**Bernadette PERHAM, Individually and on behalf of all other persons similarly situated, Plaintiff,**

v.

**Jeffrey R. LADD, Individually and as Chairman of the Board of Governors of State Colleges and Universities, et al., Defendants.**

No. 75 C 259.

United States District Court, N. D. Illinois, E. D.

July 28, 1977.

Terry Yale Feiertag, Joseph Minsky, Minsky, Lichtenstein & Feiertag, P. C., Chicago, Ill., for plaintiff.

Tefft W. Smith, Kirkland & Ellis, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

This case is before the court on the parties' cross motions for summary judgment. Fed.R.Civ.P. 56. The case is brought individually and as a class action for declaratory, injunctive and monetary relief under 42 U.S.C. §§ 1983, 1985(3) and 1988 (1970) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2 (1970 & Supp. IV 1974). The plaintiff, a former assistant professor of mathematics at Chicago State University, alleges a violation of her civil rights by defendants in refusing to grant her tenure. Plaintiff also seeks class certification for the female members of the administrative and teaching staffs of Chicago State University.[1] For the reasons stated *infra*, the motions of the parties are denied.

The plaintiff was first employed by the University as an assistant professor of mathematics in 1968. From 1968 to the fall of 1974, she was re-employed by the Board of Governors with successive, annual probationary contracts. In February of 1974, the Personnel Committee of the Mathematics Department met to discuss whether to recommend to the department chairperson that plaintiff and another professor, Donald Bunt, be recommended for tenure. Members of the committee decided by secret ballot to recommend Professor Bunt for tenure but not the plaintiff. Two of the committee members were women. Plaintiff never received the reasons for this decision.

Following recommendation by the committee to deny tenure, the chairperson of the Mathematics Department, defendant Johnsonbaugh, received written statements from the committee which stated the reasons for their refusal. Relying on them, he affirmed their decision. He also provided plaintiff with his written statement of reasons based upon committee members' statements.

Appeal from his decision was taken to the Personnel Committee of the Division of Arts and Sciences. A full hearing was had with testimony by the department chairperson and the plaintiff. Members of the Mathematics Department who made the initial decision to not recommend the plaintiff for tenure sat in this meeting but did not participate in the voting. This committee affirmed the decision of the department chairperson.

Appeal was taken to the dean of the Division of the College of Arts and Sciences, defendant Washington, who concurred in the Personnel Committee's ruling.

---

1. The parties' motion to declare a class has not been fully briefed and therefore will not be addressed in this opinion.

The plaintiff then appealed to the University Personnel Committee. The chairperson of that committee, defendant Bond, declared that appeal to that committee was untimely and that the committee was without jurisdiction until such time as a terminal contract was issued. The appeal was then referred to the University Grievance and Academic Freedom Committee (UGAFC).

Finally, on June 13, 1974, the UGAFC held a meeting to which defendant Johnsonbaugh, though invited, did not attend.[2] Defendant Blum, chairperson of UGAFC, adjourned the meeting before several members of the Mathematics Department gave any reason for their recommendation to deny tenure. A second meeting of the UGAFC was held July 15, 1974 but was quickly adjourned because the committee chairperson objected to the attempt of plaintiff's counsel to conduct it as a full adversary hearing. Subsequently, the decision not to recommend Dr. Perham for tenure was affirmed by the Vice-President of Academic Affairs, defendant Cole, and the President of the University, defendant Alexander.

The plaintiff was informed of the initial mathematics committee decision to deny her tenure but was never formally informed that the University had issued a terminal contract. Upon issuance of a terminal contract on June 30, 1975, the University Personnel Committee assumed jurisdiction over the plaintiff's appeal. Plaintiff filed suit in January, 1975. Her motion for a temporary restraining order and preliminary injunction were later denied.

At Chicago State University, tenure is granted only by the Board of Governors following recommendation by the president of the University. Any recommendations by the University committee serve only to advise the president. Responsibility for making a recommendation to the president lies with the tenured members of the academic department and the academic chairperson. If the chairperson and the department members concur, recommendation is referred to the divisional personnel committee where the vote of the tenured members of that committee is taken. On favorable vote by the divisional committee and a favorable vote by the divisional dean, recommendation is forwarded to the Academic Vice-President who in turn takes the recommendation to the president of the University. The University Personnel Committee considers only those cases where there is a disagreement between the vote of the divisional committee and the divisional dean or where a terminal contract has been issued. On the basis of the record, this procedure was complied with in Dr. Perham's case.

The substance of the plaintiff's claim is that she was denied procedural due process at various levels of University review. She also alleges that sexual bias permeated the review process and that as a result she was discriminated against on the basis of her sex in violation of Title VII and 42 U.S.C. §§ 1983, 1985(3) (1970). The court will first consider the procedural due process claim and then the sexual discrimination issue.

Plaintiff has argued that she was denied due process of law because of certain procedural irregularities, e. g., the participation of the mathematics committee members in the deliberations of the Personnel Committee of the Division of Arts and Sciences and her failure to receive proper notice that she would be issued a terminal contract for the 1974–1975 academic year. Absent a property or liberty interest, plaintiff has no right to a pretermination hearing or statement of reason for a refusal to grant tenure. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Stebbins v. Weaver,* 537 F.2d 939 (7th Cir. 1976) (per curiam), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Weathers v. West Yuma County School Dist. R–5–1,* 530 F.2d 1335 (10th Cir. 1976); *Danno v. Peterson,* 421 F.Supp. 950 (N.D.Ill. 1976). *See also Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Since the plaintiff was a probation-

2. It was at this meeting that the plaintiff first made her sex discrimination claim.

ary, non-tenured professor, she cannot claim federal constitutional protection for defects in the hearing process or the failure of the university to formally inform her of the contract termination a year in advance as required by university procedures.

*Roth,* however, does not establish that a state college teacher cannot seek federal court relief for a denial of tenure and loss of employment as a direct result of sexual discrimination. *Ford v. Jones,* 372 F.Supp. 1187 (E.D.Ky.1974). *Cf. Perry v. Sindermann,* 408 U.S. 593, 596, 92 S.Ct. 2513, 33 L.Ed.2d 570 (1972); *Hostrop v. Board of Junior College District No. 515,* 523 F.2d 569, 573 (7th Cir. 1975), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976). The defendants argue, however, that *Roth* is square authority for dismissing the plaintiff's case, noting the court is not to sit as an "appellate college committee."

> As far as the federal court is concerned the state could deny tenure to the plaintiff for no reason, a reason based on erroneous facts, or for any reason it chose except for a reason that violated the plaintiff's constitutional rights . . . Thus, even assuming that the Board arbitrarily denied tenure to plaintiff after he had 'proven' his case for tenure, the teachings of *Bishop v. Wood* indicate that the federal courts would not have a place in the controversy absent a constitutional challenge.

*Megill v. Board of Regents,* 541 F.2d 1073, 1077 (5th Cir. 1976).

Plaintiff has made such a challenge in this case and therefore the court may properly review the decision of the university.

Under Title VII, discriminatory purpose need not be proved when hiring practices which operate in a discriminatory manner are challenged. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 845, 28 L.Ed.2d 158 (1971). As a consequence, plaintiff's Title VII claim will be considered first. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) sets out the requisites for a prima facie showing under Title VII. This standard is applicable to denials of tenure on the basis of sex. *See Labat v. Board of Higher Education,* 401 F.Supp. 753 (S.D.N. Y.1975). *See also Olson v. Philco-Ford,* 531 F.2d 474 (10th Cir. 1976); *Orr v. Trinter,* 444 F.2d 128, 134 (4th Cir. 1971), *cert. denied,* 408 U.S. 943, 92 S.Ct. 2847, 33 L.Ed.2d 767 (1972); *Ford v. Jones,* 372 F.Supp. 1187 (E.D.Ky.1974); *Johnson v. University of Pittsburgh,* 359 F.Supp. 1002 (W.D.Pa.1973).

*Green* requires the following elements in order to establish a prima facie case:

> (i) that [the plaintiff] belongs to a . . . minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. *See also Olson v. Philco-Ford,* 531 F.2d 474 (10th Cir. 1976). Once the plaintiff has met the above prerequisites, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. 411 U.S. at 802, 93 S.Ct. at 1824. The defendant must prove its justification by a preponderance of the evidence. *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394 (3rd Cir. 1976). In order to meet her burden under *Green,* the plaintiff has offered three types of evidence: Statistical evidence of the relative proportions of females and males of the faculty and administration of Chicago State; an affidavit showing that the plaintiff was "better qualified" than the man chosen; and certain procedural failures in the review process which allegedly show the predisposition of the defendants to choose a male over a female for tenure.

The plaintiff may clearly rely on statistical proof in order to establish a prima facie case of employment discrimination. *Hazelwood School District v. United States,* —— U.S. ——, ——, 97 S.Ct. 2736, 53 L.Ed.2d 768, 45 U.S.L.W. 4882, 4884 (1977); *International Brotherhood of Team-*

*sters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Where a gross statistical disparity can be shown, such statistics alone have been held to establish a prima facie case. *Hazelwood School District v. United States,* —— U.S. at ——, 97 S.Ct. at 2741. Plaintiff cites three types of statistics: faculty, administrative and departmental. The thrust of plaintiff's argument is that the statistics demonstrate that the Chicago State hiring policies were designed to maintain a static percentage of women. For example, in 1965, 35 percent of the faculty of Chicago State was female. In 1975, after substantial growth of the University, the female faculty was 37 percent of the total. Similarly, the administrative staff was 13 percent female in 1965. In 1974–75, the staff was 19 percent female. In 1974, the mathematics department had 15 full-time faculty members, four of whom were female. Of those four, two were tenured. The two non-tenured were subsequently terminated. About the same time, three males were tenured.

■■■ These statistics are not relevant to prove a sex discrimination claim. First, the statistics do not represent "gross statistical disparities" which have been held to be probative of discrimination. *Hazelwood School District v. United States,* —— U.S. at ——, 97 S.Ct. at 2741 (1.4 to 1.8 percent minority staff). *See also Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (8th Cir. 1970) (1.71 percent to 1.86 percent blacks out of a work force); *Johnson v. University of Pittsburgh,* 359 F.Supp. 1002 (W.D.Pa.1973) (five tenured females out of a faculty of 401). Secondly, the plaintiff must, at the very least, make a comparison between the sexual composition of the teaching staff of Chicago State and the sexual composition of the qualified teacher and administrative population in the relevant labor market. These statistics alone

do not reflect anything since they do not reflect the opportunity or lack thereof of the school to discriminate on the basis of sex.[3]

The plaintiff offers the affidavit of a former professor in order to establish her claim. The professor concluded that the plaintiff was more qualified as a teacher than Bunt after analyzing the professional qualifications of both individuals. The professor concluded that the plaintiff had superior academic preparation, more research experience and a greater amount of supervisory experience. Defendant Johnsonbaugh, the Chairperson of the Mathematics Department, agreed that she was well qualified for tenure. Further, at the time they were being considered, Bunt did not possess a doctorate. Rather, he was working toward another degree in an area outside mathematics and mathematics education.

Finally, the plaintiff raises certain procedural failures which she contends tend to show a disposition on the part of the defendants to choose Bunt. Unusual deviations in standard procedures of review have been held relevant to show discrimination. *Jackson v. City of Akron,* 411 F.Supp. 680 (N.D.Ohio 1976). First, the plaintiff contends that Bunt was beyond the university policy guideline period for consideration for tenure. The Board of Governor Policies state that a professor may not be considered for tenure if he has taught at Chicago State or any other institution for more than seven years. Professor Bunt was a professor at a Maryland College for a year and half before coming to Chicago State where he spent six years. He was clearly beyond the seven-year limitation period. Further, the plaintiff alleges that the Vice-President for Academic Affairs, admitted interfering in "departmental personnel matters" in behalf of males on three different occasions.

---

**3.** "The law is well-settled that the relevant consideration of an employment discrimination case is the statistical disparity between the proportion of blacks in the employer's workforce and the proportion of blacks in the labor market." *United States v. Hazelwood School District,* 534 F.2d 805, 812 (8th Cir. 1976), *rev'd*

*on other grounds,* —— U.S. ——, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Further, where statistics are presented concerning an extremely small group, they have questionable value. *Harper v. Trans World Airlines, Inc.,* 525 F.2d 409 (8th Cir. 1975).

■ On the basis of these facts it is clear that the plaintiff has established a prima facie case of sex discrimination under Title VII. The defendants contend however that the plaintiff was not in fact qualified for tenure and a material issue of fact is therefore raised. See Fed.R.Civ.P. 56. Defendants argue that a number of factors militated against her being granted tenure. First, the department members concluded that the plaintiff's work had departed from the goals of the department. She was originally hired to teach in the secondary math area. While at Chicago State her research and educational development was elementary or school oriented. However the courses plaintiff taught were taught in part by a male faculty member hired since the plaintiff's termination. The elementary school area was already taught by two tenured professors. Further, the department found it necessary to accommodate an increased demand in pure math, computer science and business mathematics.

The defendants further point to Dr. Perham's increasing and more intense professional disagreements with the department. The plaintiff did acknowledge that her involvement in elementary education projects produced substantial controversy within the department. There are additional allegations that the plaintiff limited the courses she would teach and refused to teach or serve with other members of the department on committees. The plaintiff disputes this. She contends that the whole department was a "hornet's nest" of controversy, most of which she was successful in avoiding. Finally, the plaintiff was unable to cite many cases of actual bias at her career at Chicago State. From 1968 to 1972 she could recollect no such instances. During 1973, she cited three minor instances of alleged bias. In 1974, the sole instance was her denial of tenure. As to her superior qualifications for tenure, the plaintiff conceded during her deposition that she had no evidence which indicated Bunt was not qualified.

■ Professional disagreements with members of an academic department are

sufficient, nondiscriminatory reasons to deny tenure. See *Poddar v. Youngstown State University,* 480 F.2d 384 (6th Cir. 1973); *Van de Vate v. Boling,* 379 F.Supp. 925 (E.D.Tenn.1974); *Watts v. Board of Curators,* 363 F.Supp. 883 (N.D.Mo.1973), *aff'd,* 495 F.2d 384 (8th Cir. 1974). Refusal to accept valid teaching assignments is clearly another valid reason for refusal. *Id.*

■ A genuine issue of material fact is therefore raised concerning the qualifications of the plaintiff for tenure. Additionally, a factual issue is raised concerning the defendants' alleged nondiscriminatory reason for denial. The plaintiff disputes the defendants' allegation that she was directly involved in the disputes of the department, refused teaching assignments and departed from the goals of the department. Therefore, the parties' motions as to the Title VII claim are denied.

■ An additional element, however, is required in a cause of action under 42 U.S.C. §§ 1983, 1985(3) (1970). The plaintiff must show purposeful discriminatory acts. Something more than discriminatory impact must be shown. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The procedural failures coupled with the university's concession that the plaintiff was qualified for tenure plus the subsequent hiring of a male to teach the plaintiff's courses could lead the fact finder to draw the inference that the denial itself was a purposeful one. As Mr. Justice Stevens noted in *Washington* "the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume." *Id.* at 254, 96 S.Ct. at 2054. Whether or not there was such a purpose can only be determined after the facts are fully explored at trial.

Accordingly, the parties' cross motions for summary are denied.

It is so ordered.